**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-CR-227 (TJK)** |
| **FLOYD CLARK,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. The defendant, Floyd Clark, is before this court after pleading guilty to Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1), after he participated in a drive-by shooting, using a handgun outfitted with a Glock converter switch, effectively turning the handgun into a machinegun, and shooting that machinegun near a school. For the reasons that follow, the United States respectfully requests that the court sentence the defendant to a term of **57 months' imprisonment** and three years of supervised release.

I.      <u>**FACTUAL BACKGROUND**</u>

The factual proffer to which the defendant agreed as part of his September 24, 2025 guilty plea establishes the following uncontested facts:

On March 1, 2025, officers with the Metropolitan Police Department's ("MPD") Sixth District responded to the 300 block of 50 Street, NE, Washington, D.C., after receiving a detection warning of 14 rounds of automatic gunfire. Once on the scene, the MPD officers located fourteen .40 caliber shell casings. No victims were located. The responding officers did not observe any

1

destruction of property. Based on MPD officers' observation of recovered video footage of the incident, two shooters fired bullets from their respective firearms from a stolen black Infiniti. The defendant, Floyd Clark, was located in the passenger's side of the car, and the other shooter was located in the driver's side of the car. As the black Infiniti began driving away, the passenger side door opened, and the passenger brandished a handgun. The defendant voluntarily and on purpose possessed a firearm, later determined through a National Integrated Ballistic Information Network ("NIBIN") check to be a Glock 22 .40 caliber handgun (serial #BGBM995).

On March 8, 2025, officers with the MPD's Robbery Suppression Unit ("RSU") were working an evening tour of duty in and around the intersection of 60th Street, NE, and Eads Street, NE, Washington, D.C. Shortly after 6:10 pm, MPD officers saw a black Infiniti Q50 that matched the description of the black Infiniti Q50 that was used in the March 1 shooting and began following it. The defendant, who was driving the car, stopped the car, and he and an unidentified second male, jumped out of the car and proceeded to run away from police officers. After a brief foot chase, the defendant was arrested. Police recovered a Glock 22 .40 caliber handgun (serial #BGBM995) from the front driver's floorboard of the black Infiniti. This firearm was loaded with one round in the chamber and an additional twenty-one rounds in a twenty-two round capacity magazine. It was outfitted with a Glock converter switch. A NIBIN check generated a lead associating this Glock 22 with the expended shell casings recovered from the scene of the shooting that occurred on March 1, 2025.

A second handgun was recovered from the unknown person's flight path. It was a Glock 23 .40 caliber handgun (serial #XML849). This firearm was loaded with one round in the chamber and an additional twenty-one rounds in a twenty-two round capacity magazine. It was also outfitted with a Glock converter switch.

There are no firearms or ammunition manufacturers in Washington, D.C. Therefore, the Glock 22 .40 caliber handgun (serial #BGBM995), the Glock 23 .40 caliber handgun (serial #XML849), and the ammunition contained within the respective firearms officers recovered must have travelled across state lines. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) examined the Glock 22 .40 caliber handgun (serial #BGBM995) and the Glock 23 .40 caliber handgun (serial #XML849) and determined that both firearms were "machineguns."

The defendant has a prior criminal felony conviction punishable by a term of incarceration greater than one year. On December 15, 2023, the defendant was convicted of Carrying a Pistol without a License in Washington, D.C. Superior Court case number 2023-CF2-006739. As a result, the defendant was aware at the time of the instant offense that he had a prior conviction for a crime punishable by more than one year.

## II.   **PROCEDURAL HISTORY**

On March 12, 2025, the United States Attorney's Office for the District of Columbia filed a one-count Complaint, charging the defendant with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) for carrying a handgun on March 8, 2025. On March 13, 2025, the defendant was arrested and had his initial appearance before the United States Magistrate Judge G. Michael Harvey. At that hearing, the Government made an oral motion, asking that the defendant be held pending trial. Judge Harvey set a detention hearing for March 18, 2025. On that date, Judge Harvey, after hearing arguments from both parties, granted the Government's motion to detain the defendant pending trial.

On August 8, 2025, the United States Attorney's Office for the District of Columbia filed a one-count Information, charging the defendant with Unlawful Possession of a Firearm and

Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1) for carrying a handgun on March 1, 2025. On September 24, 2025, the defendant pleaded guilty to the one-count Information. In return, the Government agreed to ask for a sentence within the calculated guideline range sentence of 46 months to 57 months' incarceration.

## III.    LEGAL STANDARD

Under the plea agreement, Mr. Clark agreed that the sentence in this case would be determined by the court, pursuant to the factors set forth in 18 U.S.C. § 3553(a). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>>> (i) issued by the Sentencing Commission ...; and
>>> (ii) that, . . . are in effect on the date the defendant is sentenced; ...
>
> (5) any pertinent policy statement –
>> (A) issued by the Sentencing Commission ... and

(B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## IV.    ANALYSIS OF U.S. SENTENCING GUIDELINES

The parties and Probation concur that the defendant's total offense level is 21 and his criminal history category is III, resulting in a guidelines range of 46 to 57 months' imprisonment. There is no dispute concerning the guidelines calculation.

## V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION

The crimes at issue here merit a lengthy term of incarceration. In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence imposed to reflect the seriousness of the offense and to promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities, § 3553(a)(6).

### A.  Nature and Circumstances of the Offense

The nature and circumstances of this offense are serious and warrant a very lengthy sentence of imprisonment. Although Mr. Clark has pled guilty to unlawful possession of a firearm, as made clear by his proffer of fact and a video that captured the drive-by shooting, he is culpable of so much more. Here, Mr. Clark: (1) participated in a drive-by shooting; (2) during that drive-by shooting, he possessed a firearm outfitted with a Glock converter switch, which enabled the firearm to operate as a machinegun; and (3) fired that machine gun in public, near a middle school and recreation center, where children may have been present.

On the video that captured the drive-by shooting, a black car is seen entering the screen from the righthand side. *See* Gov't Ex. 1 at 8:46. In the center of the screen, a gentleman is walking down the sidewalk, minding his own business, as Mr. Clark and his accomplice drive up. As the innocent bystander is walking away from the black sedan, the driver extended his hand out of the driver's window and shoots at the bystander. *Id*. at 8:50. Seconds later, Mr. Clark opened his door and fired his gun as well. *Id*. at 8:53. The hail of bullets sent the innocent bystander and a group of people running for cover to avoid being killed. Mr. Clark's accomplice turned right onto Banks' Place and drove away. A man then emerged from hiding behind a grey car, carrying a small child wearing a pink coat. *Id*. at 9:01. The video shows the man checking on the small child to confirm that it had not been shot by one of the bullets that the defendant and his accomplice shot in their direction. After police arrived on the scene, they recovered fourteen .40 caliber shell casings.



**Image 1: Recovered Shell Casings.**



**Image 2: Map of Drive-by Location. Red "X" is the Scene of the Shooting.**

The fact that Mr. Clark shot at innocent bystanders is problematic enough. The weight of

Mr. Clark's crime is compounded by the fact that he did so near a school and recreation center,

where children might be playing. Video evidence shows that Mr. Clark and his accomplice shot at

at least one child. According to Google Maps, Mr. Clark and his accomplice shot automatic guns

in the direction of Kelly Miller Middle School, approximately 625 feet away. In the video of the

drive-by shooting, one can see the back of the middle school. According to the middle school's

website, it has 550 students (Grades 6 through 8) and 50 staff. *See* Kelly Miller Middle School,

https://www.kellymillerms.org/. The shooting was even closer to the Kelly Miller Recreation

center, a place where small children play. Given the proximity of the school and rec center to the

drive-by shooting, Mr. Clark and his accomplice are incredibly lucky that a stray bullet did not hit

a child.

Given the circumstances, the possessory nature of Mr. Clark's crime does not mitigate the

danger he presented to the community. Although Mr. Clark was not the driver, the fact is that he, along with an accomplice drove, into a residential neighborhood – near a school and rec center – and unleashed a barrage of automatic gunfire in broad daylight.



**Images 3 and 4: Photographs of Firearm Recovered on March 8, 2025.**

Mr. Clark's dangerous conduct is exacerbated by the fact that his firearm was intentionally modified to make it even more deadly. Specifically, the firearm was equipped with a machine gun conversion device. On April 23, 2025, the Bureau of Alcohol, Tobacco, Firearms (ATF) and Explosives examined the firearm that Mr. Clark possessed on March 1 and determined that the Glock converter switch enabled his firearm to operate as a machinegun.[1] With a single squeeze of the trigger, Mr. Clark's gun would spray bullets almost simultaneously upon anyone who might be in range. These illegal machinegun conversion devices are particularly dangerous because they are not professionally manufactured, and these handguns are not intended to operate as machineguns. Indeed, trained ATF experts can rarely fire such guns accurately.[2] *See* Gov't Ex. 2. If Mr. Clark were to pull that trigger, the gun would fire all of its

---

[1] The ATF's firearms examination report was sent to defense counsel for the defendant on April 28, 2025.

[2] The Government is providing to the Court contemporaneously with this filing a video, marked as Exhibit B, demonstrating an ATF agent test-firing a firearm equipped with a machinegun conversion device.

bullets indiscriminately in different directions.  As modified, this was no weapon of self-defense.
This illegal machinegun was a deadly killing weapon.

Notably, there has been an exponential boom in machine gun conversion switches
nationwide.  *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, 4-5 (2023) "National
Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two,"
https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-vii-recommendations/download
(noting 570% increase in recovered machine gun conversion parts in 2017 to 2021 compared to
2012 to 2016).  Our community has not escaped this alarming trend. Indeed, the dramatic
increase in machinegun conversion devices recovered in the past few years alone is frightening.
Below are the estimated number of recovered machinegun conversion devices recovered in
Washington D.C., according to ATF:

- 2021:  27 Machinegun Conversion Switches Recovered

- 2022:  119 Machinegun Conversion Switches Recovered

- 2023:  195 Machinegun Conversion Switches Recovered

- 2024:  200 Machinegun Conversion Switches Recovered

In other words, there was an over 340% increase in recoveries of machinegun conversion
devices in the District from 2021 to 2022.  This alarming trend accelerated in 2023 and 2024,
with an over 640% increase in recoveries of machinegun conversion devices in the District from
2021 through 2024.

Possession of the firearm alone would be extremely serious. However, the fact that Mr.
Clark participated in a drive-by shooting and discharged a machinegun in a residential
neighborhood, near a school, in broad daylight justifies a significant term of incarceration.

**B.  Mr. Clark's History and Characteristics**

Mr. Clark's criminal history also weighs in favor of a significant term of incarceration. The instant conviction is not Mr. Clark's first conviction for unlawfully possessing a firearm. It's not even his second conviction. It is his third.

On April 26, 2023, Mr. Clark pled guilty to Attempted Carrying a Pistol Without a License ("CPWL") and Attempted Possession of a Large Capacity Ammunition Feeding Device in D.C. Superior Court case 2023-CF2-001113. *See* Gov't Ex. 3. In the factual proffer signed by Mr. Clark, he admitted that on February 24, 2023, police attempted to do a traffic stop on an SUV near 153 Todd Place NE. In response, the SUV took off and traveled the wrong way on Florida Avenue NE, ultimately striking another vehicle. An MPD Officer saw three individuals exit the SUV and flee on foot, and ultimately stopped him. During a search incident to an arrest, officers found a Glock 45 that had a seventeen round magazine and one round inside of the chamber in Mr. Clark's pants. For both counts, the defendant was sentenced under the Youth Rehabilitation Act to 60 days of incarceration with execution of the sentenced suspended as to all, as well as nine months' supervised probation. The sentences were ordered to run concurrently. On November 14, 2023, after Mr. Clark was arrested again for CPWL, he was re-sentenced to 60 days' incarceration.

On October 14, 2023, Mr. Clark pled guilty to CPWL in Superior Court Case 2023-CF2-006739. *See* Gov't Ex. 4. In the factual proffer signed by Mr. Clark, he admitted that on September 19, 2023, he was carrying a firearm in his pants. That firearm was a Glock 19 9mm with one round in the chamber and twenty-three rounds in a twenty-four-round magazine. Mr. Clark was sentenced to twelve months and one day of incarceration, and three years' supervised release. What's notable is that the defendant was on supervised probation from his first conviction when he was arrested for this second offense. It is also notable that during the instant offense, Mr. Clark was still on

supervised release for his second CPWL charge.

Mr. Clark's criminal history shows that he is escalating in his criminality. Despite being a young man, he quickly escalated from possessing firearms to using them. Mr. Clark has already been convicted of two firearms offenses, both involving large capacity magazines. The sentences in those cases, and being on supervised release, have not deterred him from continuing to illegally acquire guns. Here, Mr. Clark possessed an even more dangerous gun as it was equipped with a converter switch, effectively making it a machinegun. When afforded the opportunity to be released into the community twice on supervised release, Mr. Clark violated the law during both times. Despite the structure provided during his prior incarceration, Mr. Clark was undeterred and continued to violate the rules and regulations put in place.

Mr. Clark's escalating criminal behavior and the fact that he was given two previous chances to learn from his mistakes and did not is evidence that a lengthy period of incarceration is warranted.

### C. The Need for the Sentenced Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

While thankfully no one was injured in the instant case, the recklessness and impulsivity combined with the firepower Mr. Clark possessed heightened the danger to the community. A significant term of incarceration is necessary to incapacitate the defendant and protect the community.

As mentioned previously, Mr. Clark fired a loaded machine gun at someone, and he did so near a school, in broad daylight. He is lucky that the person he fired the machinegun at, or other innocent bystanders, were not seriously injured or killed. A lengthy sentence appropriately reflects the seriousness of the defendant's actions.

### D.  The Need for the Sentence to Afford Adequate Deterrence

A significant sentence of incarceration is needed to both generally deter violent offenses in the District and to deter Mr. Clark from perpetrating violent crimes in the future. As is evident from the defendant's criminal history, he is increasingly becoming violent and a lengthy prison sentence is needed to deter him from continuing down the path that he is currently on. Previously Mr. Clark was sentenced to 60 day's incarceration and 12 month's incarceration for his prior two firearms convictions. Those sentences were clearly not sufficient to deter Mr. Clark from carrying firearms. The sentence the Government is asking for hopefully is sufficiently lengthy to deter Mr. Clark from continuing his criminality. Moreover, the sentence sends a message that committing drive-by shootings near schools will be punished severely.

### E.  The Need to Avoid Sentence Disparities

According to the report filed by Probation, defendants with an Offense Level of 21 and a Criminal History Category of III, on average receive a sentence of 46 months' imprisonment – the bottom of the calculated guidelines in this case. Such a sentence is not warranted here for all the previously recounted reasons, namely: (1) the defendant participated in a drive-by shooting; (2) during that drive-by shooting, he possessed a firearm outfitted with a Glock converter switch, which enabled the firearm to operate as a machinegun; and (3) he fired that machine gun in public, near a school. Any one of these facts would warrant sentencing the defendant above the average sentence received by other defendants. However, the combination of all three facts, makes this instant case more egregious than the average case, where a defendant might have simply possessed a firearm, but did not discharge it.

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully recommends that the court sentence Defendant Floyd Clark to 57 months' imprisonment, to be followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:      /s/ *Jared English*_____
JARED ENGLISH
D.C. Bar No. 1023926
Assistant United States Attorney
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-465-0089
Email: Jared.English@usdoj.gov

# Government Exhibit 1
## (Video Provided Separately)

# Government Exhibit 2
## (Video Provided Separately)

# Government Exhibit 3

## **PROFFER OF FACTS**

Had case number 2023 CF2 001113 proceeded to trial, the Government's evidence would have proven beyond a reasonable doubt that on February 24, 2023, at approximately at 23:32 hours, near 153 Todd PL NE, Metropolitan Police Officers received a radio run for a suspicious person in a dark gray SUV. Officers Williams and Nettles canvassed the area for the vehicle described in the radio run and saw a vehicle that appeared to be related to the call for service. They attempted to do a traffic stop on the SUV, but the SUV took off and traveled the wrong way on Florida Ave NE, ultimately striking another vehicle. Officer Williams saw three individuals exit the SUV and flee on foot in the 100 block of New York Ave NE. Officer Williams ultimately stopped the Defendant, Floyd Clark, and placed the Defendant in handcuffs. Officer Williams asked Mr. Clark if he had a weapon on his person, and Mr. Clark said "yes." Mr. Clark informed Officer Williams that his weapon was in his pants.

Officer Williams recovered from Mr. Clark's pants a black in color Glock 45 with serial number BVAG395 that had a tan, 17 round magazine with 1 round inside of the chamber.

The handgun appeared to be fully functional and capable of being fired with one hand. The handgun had an overall length less than twelve inches and was designed to fire a projectile by means of an explosion. On February 24, 2023, the Defendant did not have a license to carry a pistol in the District of Columbia. At the time that the Defendant was carrying the pistol, he did so voluntarily and on purpose and not by mistake or accident.


### DEFENDANT'S ACKNOWLEDGMENT

I have read and discussed the Government's Proffer of Facts with my attorney. I agree and acknowledge by my signature that this Proffer of Facts is true and correct.

Date: 4|26|23

**Floyd Clark**
Defendant

Date: 4|26|23

**Raymond Jones, Esq.**
Attorney for Defendant

1

# Government Exhibit 4

## PROFFER OF FACTS

Had this case gone to trial, the Government's evidence would have proven beyond a reasonable doubt that on September 19, 2023, at 501 60th Street NE, Washington, D.C., Defendant Floyd Clark did carry, openly and concealed on or about his person, in a place other than his dwelling place, place of business or on other land possessed by him, a pistol, without a license issued pursuant to law. Specifically, officers from the Metropolitan Police Department observed Defendant smoking marijuana in public. When officers approached Defendant, they noticed the outline of a firearm in the front of Defendant's pants. When officers conducted a protective patdown, they recovered a firearm directly from Defendant's pants.

The firearm was a black in color Glock 19 9mm, bearing serial number BWSL220 on the frame and ABPM887 on the slide, and loaded with one round in the chamber and twenty-three rounds in a 24-round magazine. The firearm appeared to be fully functional, had a barrel length of less than 12 inches, was designed to be fired with a single hand, and was capable of expelling a projectile by means of an explosion.

Defendant was not licensed to carry a firearm in the District of Columbia and was not otherwise excused from the District's firearm licensing and registration requirements. A search of law enforcement records revealed that the firearm was not registered in the District of Columbia.

Defendant carried the firearm voluntarily and not by mistake or accident. There was no legal justification for Defendant's actions.

### DEFENDANT'S ACKNOWLEDGMENT

I have read and discussed the Government's Proffer of Facts with my attorney. I agree and acknowledge by my signature that this Proffer of Facts is true and correct.


Date: 10|14|23


**FLOYD CLARK**
Defendant


Date: 10|14|23


**Camille Wagner, Esq.**
Attorney for Defendant

1